IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | CRIMINAL NO. 16-201 (PAD) |
| ARIEL HERRERA-CASTILLO (2), | |
| Defendant. | |

**OPINION AND ORDER**

Delgado-Hernández, District Judge.

On March 30, 2016, defendant Ariel Herrera-Castillo was charged with aiding and abetting a prohibited person -an illegal alien- in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(5)(A) and 2 (Docket No. 8).  Before the court is defendant's "Motion to Suppress" (Docket No. 32), which the government opposed (Docket No. 40).  Because the search-incident-to-lawful arrest and automobile exceptions to the Fourth Amendment's warrant requirement sustain the search that uncovered the evidence defendant seeks to suppress, his motion is DENIED.

**I.   FACTUAL BACKGROUND[1]**

On March 23, 2016, HSI agents initiated surveillance operations in El Caracol, an area known for human and drug smuggling in road PR-165 in Dorado, Puerto Rico.  The area is close

---

[1] On December 1, 2016, the court conducted an evidentiary/argumentative hearing (Docket No. 45). The government presented the testimony of Homeland Security Investigations ("HSI") Special Agent Ricardo Morales and various exhibits. Id. Defendant presented exhibits but did not present witnesses. Id. He complains that during his testimony, Special Agent Morales provided information not included in affidavits previously subscribed by HSI Special Agent Juan Miranda, HSI Special Agent Gerardo E. Mujica, and Special Agent Morales in this case (Transcript at pp. 128-130). The affidavits were prepared in connection with (1) a search warrant (Special Agent Morales, Docket No. 40-3); (2) a criminal complaint (Special Agent Miranda, Docket No. 32-1); and (3) the government's opposition to defendant's motion to suppress (Special Agent Mujica, Docket No. 40-1). The information included in the affidavits served to support the purpose for which the affidavits were prepared. They do not taint Special Agent Morales' testimony for purposes of the suppression defendant has requested. The court finds the testimony credible.

by to the Dorado downtown, a river, a beach, and a business called El Caracol (Transcript at pp. 6-8). It does not have much lighting, and is particularly dark in the late evening. Id. at pp. 7-10.

During the early morning hours of March 24, 2016, agents identified a Gray Nissan Armada with Puerto Rico license plates transiting back-and-forth between El Caracol and downtown Dorado. Id. at p. 10. The vehicle made this transit, without interruption, several times. At that point in the day, the area is not commonly visited by many people. Id. at p. 10. From previous cases, agents know that drug smugglers coming in from the sea in small boats from the Dominican Republic, commonly coordinate via telephone with people in the land, in vehicles, that are waiting for the boats to arrive for a quick meet, pick up, and deployment from that particular area where they usually abandon the boats. Id. at p. 11.

In one of those runs, described as "suspicious" or "erratic" during the suppression hearing (Transcript at pp. 10-11), the Nissan Armada came close to the HSI supervisor's vehicle, allowing him to observe whom he believed to be Aude De La Cruz-Polanco (aka: "Bolo") inside the Nissan Armada. Id. at pp. 10, 13. Special Agent Morales identified Aude as a HSI immigration target, a known national of the Dominican Republic who had been deported from the United States in Puerto Rico in December 2012. Id. at p. 13.[2]

At approximately 6:00 a.m., surveillance crews in at least two separate unmarked HSI vehicles followed and went after the Nissan Armada as it departed the Dorado area and travelled in the direction of Bayamón, Puerto Rico. Id. at p. 15. The Nissan Armada was eventually stopped in Santa Juanita Avenue in Bayamón. Id. at pp. 15-17.[3] Special Agent Morales –the agent in the

---

[2] Aude is a codefendant, defendant number one in this case (Transcript at p. 13).

[3] Agent Morales received instructions from his supervisor to stop the Nissan Armada (Transcript at p. 16). They turned on the blue lights and the sirens in their vehicles, but the Nissan Armada did not stop. Agent Morales' vehicle took over the left side, allowing him to see Aude sitting in the front passenger seat of the vehicle. Id. at p. 17. It took a while and multiple instructions and

front passenger seat of one of the surveillance vehicles- recognized Aude, for he had investigated Aude since 2012, was investigating him on March 23d, and was specifically looking for him that day. Id. at pp. 41-43.

Once the Nissan Armada stopped, Special Agent Morales maintained his government-issue rifle at "on the ready," while other agents started pulling people out of the vehicle. Four persons were apprehended.[4] As each person was taken out of the Nissan Armada, he was thrown or placed on the ground, patted down, handcuffed, and moved ten to twenty feet to the side from the road toward a closed business for safety, where each of the detained persons was slightly separated from the others to prevent them from speaking to each other. Id. at pp. 19-20, 28, 60-61, 73. Special Agent Morales' vehicle stopped across the front of the Nissan Armada, slightly blocking it. Id. at p. 59. Other HSI vehicles parked behind the Nissan Armada as vehicles from the Puerto Rico Police Department came into the scene. Id. at pp. 59-60.

When Aude was patted down, officers raised his shirt because they felt a bundle underneath it and saw that he had a Global Positioning System ("GPS") in a waterproof pouch hanging from his neck under his shirt. Id. at p. 68. In the agents' training and experience, drug and alien smugglers use those types of devices to coordinate the exact meeting location between boats coming from the water with drugs or aliens to meet with the ground people in previously agreed meeting points. Id. at pp. 20-21. The other individuals had sand in the bottom of their pants and

---

commands for the vehicle to pull over. Id. After Special Agent Morales pointed his government issued rifle towards the Nissan Armada, the vehicle stopped. Id.

[4] To wit, Aude; the defendant, who was driving the vehicle; and Danilo De La Cruz-Polanco and Noel De Leon-De La Rosa – both of whom were, like Aude, illegally present in the United States (Transcript at pp. 82-83).

all over and inside their shoes, which for agents was indicative that they had been in the beach, in the sand, looking for a boat that was about to arrive or was supposed to arrive. Id. at p. 21.

Special Agent Morales ordered the vehicle searched. From his testimony, he did so because at the time of the interdiction he had probable cause to arrest Aude for reentry after deportation and alien smuggling. Id. at pp. 27, 29. Accordingly, he ordered a search (1) of the area immediately accessible to Aude for evidence of the crime being committed such as cell phones for communications to coordinate between the boat arriving to land and the people picking up individuals coming in on the boat; personal identification documents; papers indicating names, locations, addresses, and coordinates; maps; GPS devices; insect repellent; firearms; food; and water; and (2) to look for more people that might be in the cargo area of the vehicle. Id. at pp. 28-30.

Initially, the Nissan Armada was searched for people, to make sure there were no more passengers inside the vehicle, and subsequently, a more particular search was done in the area immediately accessible to Aude. Id. at p. 32. During the search of the area immediately accessible to Aude, inside the center console of the vehicle between the front passenger and driver seats, agents found the firearm and ammunition which is the subject of the indictment: a Baretta PX4 Storm 9mm pistol, bearing serial number PY34648 and 8 rounds of ammunition. Id. at p. 33.

The detainees were taken to the HSI office in Guaynabo, Puerto Rico for further investigation. Id. at p. 34. The vehicle was transported to, and stored in the same location. Id. Thereafter, agents sought and obtained a search warrant to search the Nissan Armada. The search uncovered a nautical map, a fixed-point divider, and miscellaneous documents (Docket No. 40 at p. 3). Defendant claims the warrantless search was illegal in violation of the Fourth Amendment, and by extension, that the evidence obtained should be suppressed (Docket No. 32 at p. 8).

## II.   DISCUSSION

### A.   Analytical Framework

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. U.S. Const. amend. IV. Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions. Arizona v. Gant, 556 U.S. 332, 338 (2009). Two of the exceptions to the warrant requirement are a "search incident to a lawful arrest," id., and the "automobile exception." Pennsylvania v. Labron, 518 U.S. 938, 940 (1996). These exceptions are discussed below.

#### 1.   Search Incident to Lawful Arrest

The modern search-incident-to-lawful arrest doctrine emerged from Chimel v. California, 395 U.S. 752 (1969). As the Supreme Court observed:

> [w]hen an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as once concealed in the clothing of the person arrested. Id. at 762-763.

Thus, based on the rationales of officer safety and preservation of evidence, the Supreme Court limited the permissible scope of a search incident to arrest to the arrestee's

person and the area within his immediate control – that is, the area from within which he might gain possession of a weapon or destructible evidence. Id. at 763. The limitation is intended to ensure that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy. Id.

In New York v. Belton, 453 U.S. 454 (1981), the Supreme Court considered Chimel's application to the automobile context. In that case, a police officer stopped a speeding vehicle and made contact with the driver and three passengers while all occupants were seated in the vehicle. Id. at 455-456. Upon smelling marihuana and observing an envelope on the car floor marked "Supergold" – a name he associated with marihuana – the officer ordered the occupants out of the vehicle, placed them under arrest, and patted them down. Id. at 456. Without handcuffing the arrestees, the officer split them up into four separate areas of the Thruway so they would not be in physical touching area of each other, and searched the vehicle, including the pocket of a jacket on the backseat, in which he found cocaine. Id.

The state court found the search unconstitutional, concluding that after the occupants were arrested the vehicle and its contents were safely within the exclusive custody and control of the police. Id. at 460. The Supreme Court reversed. Noting the lack of consistency among courts in deciding how much of the automobile the police could search incident to arrest and the desirability of a bright-line rule to guide police officers in the conduct of their duties, the Court held that the area within an arrestee's immediate control encompassed not only the passenger compartment of an automobile that the arrestee recently occupied, but also containers within the passenger compartment. Id. at 458-460.

In light of Bolton, courts of appeals gave different answers to the question whether a vehicle must be within an arrestee's reach to justify a vehicle search incident to arrest. See, Gant, 556 U.S. at 342 (so recognizing). The prevailing view, however, was that a vehicle search was authorized incident to every arrest of a recent occupant even when the vehicle's passenger compartment was not within the arrestee's reach at the time of the search. Id. at 342-343. And so, addressing this split in opinion the Supreme Court held in Gant that: (1) the Chimel rationale authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search ("safety rationale"); and (2) circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe that evidence relevant to the crime of arrest might be found in the vehicle ("evidentiary justification"). Id. at 344. Applying those parameters to the facts in Gant, the Supreme Court concluded that the search was unreasonable. Id.

First, as opposed to Belton, which involved a single officer confronted with four unsecured arrestees, in Gant there were five officers and three arrestees. Additionally, the defendant and the other arrestees were handcuffed and secured in separate patrol cars before officers searched the vehicle. Because the defendant was not within reaching distance of the car at the time of the search, the safety rationale did not support the search. Second, the defendant had been arrested for driving with a suspended license – an offense for which police could not expect to find evidence in the passenger compartment of the car. In consequence, there was no evidentiary basis to search the vehicle. Id. at 344. Measured against the Gant regime, defendant's challenge falls short.

    **i.**    **Legality of Detention**

To justify a warrantless search incident to an arrest, the arrest must be legitimate. See, Whiteley v. Warden, 401 U.S. 560, 568 (1971)(excluding from trial evidence secured as incident

to an unconstitutional arrest).[5]  A warrantless arrest is permissible if there is probable cause to believe that the arrestee has committed a crime.  See, United States v. Bizier, 111 F.3d 214, 216-217 (1st Cir. 1997)(so recognizing).  Probable cause exists if at the time of arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense.  Id. at 217.  The requirement was met in the instant case, for Aude was identified as an illegal alien and defendant was driving a vehicle with Aude onboard.  Further, the vehicle was registered to a corporation and had been moving suspiciously at night and early morning hours in an area known for human smuggling.[6]

Defendant contends agents had no cause for the stop, because driving through the night is not illegal, driving a vehicle registered to a corporation is not illegal, and driving a vehicle in what

---

[5] Agent Morales testified that at the time of the search, defendant was detained but not under arrest (Transcript at p. 32).  As a practical matter, however, defendant was under arrest.  Even though there is no "litmus-paper test" to determine whether any particular mode of detention amounts to a *de facto* arrest, United States v. Acosta-Colón, 157 F.3d 9, 14 (1st Cir. 1998), it is often said that a *de facto* arrest exists "when a '"reasonable man in the suspect's position would have understood his situation, in the circumstances then obtaining, to be tantamount to being under arrest'."  Id., quoting United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994).  Characteristics ordinarily associated with an arrest include officers' assertion of authority; drawing of weapons; use of handcuffs; and physical restraints.  See, Acosta-Colón, 157 F.3d at 18 (analyzing factors in process of distinguishing arrest from investigative stop).  See also, Kaupp v. Texas, 538 U.S. 626, 630 (2003)(providing examples of circumstances that might indicate a seizure of a person within the meaning of the Fourth Amendment, including the threatening presence of several officers; the display of a weapon by an officer; some physical touching of the person; or the use of language or tone of voice indicating that compliance with the officer's request might be compelled, in concluding that circumstances showed arrest rather than investigative stop).  Id. at 630 (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)).  Here, HSI agents asserted their authority to stop the vehicle; an officer repeatedly identified himself as police, maintaining a rifle "on the ready;" officers pulled the occupants (including defendant) from the vehicle, instructed them not to move, threw or placed the detainees on the ground, handcuffed the detainees and patted them down.  Moreover, officers moved the detainees from the vehicle to an adjacent area where they were physically separated to prevent them from talking to each other, while an officer guarded them (Transcript at pp. 19-20, 61-62).  It took officers a while to get everyone secured.  Id. at p. 68.  The initial detention escalated into a *de facto* arrest.  See, Florida v. Royer, 501 U.S. 491, 497-501 (1983)(recognizing continuum of encounters between individuals and law enforcement officers running from consensual encounters beyond the scope of the Fourth Amendment; to limited and temporary investigatory stops with elements constituting a seizure not an arrest, but requiring articulable suspicion of criminal activity; up to arrests requiring probable cause).

[6] As soon as the Nissan Armada was identified as suspicious, one of the agents in the surveillance team ran the vehicle's registration in data bases of the Puerto Rico Department of Motor Vehicles (Transcript at pp. 21-22).  The registration "came back" to a corporation.  Id.  In Special Agent Morales' experience, people involved in drug and alien smuggling do not have or do not use vehicles in their names to conduct smuggling because that conceals their identity from law enforcement.  Id. at p. 22.  They try to avoid detection by not placing their assets into their names.  Id. at pp. 26-27.

agents understand is a high crime area is not illegal (Transcript at p. 109). Location by itself is ordinarily insufficient to justify a stop. See, United States v. Stanley, 915 F.2d 54, 56 (1st Cir. 1990)(so acknowledging). But officers may consider the characteristics of the area in which they encounter a vehicle. See, id. (noting that although officers would not have been justified in stopping defendant based merely on his presence in a parking lot, the reputation of the area for narcotics transactions was an appropriate factor in determining the reasonableness of the stop).[7] Similarly, conduct innocent in the eyes of the untrained may carry entirely different messages to the experienced or trained observer such as Special Agent Morales. Id.[8]

Defendant maintains that if HSI agents had seen Aude in El Caracol, they should have stopped him the moment they spotted him (Transcript at pp. 99, 104). Nonetheless, the Fourth Amendment permits warrantless arrests in public places where an officer has probable cause to believe that a felony has occurred. See, Florida v. White, 525 U.S. 559, 565-566 (1999)(so stating). It is of no moment that the government had ample time to obtain a warrant but did not procure one. See, United States v. De Masi, 40 F.3d 1306, 1312 (1st Cir. 1994)(pointing out that the necessary inquiry is not whether there was a warrant or whether there was time to get one, but whether there was probable cause at the time of the arrest). Agents here had probable cause to arrest both Aude and the defendant, and the arrests were effected in a public space. Hence, no warrant was required. Whether or not the agents "could have obtained one prior to making the arrests is irrelevant." Id. at 1312.

---

[7] See also, United States v. Brown, 188 F.3d 860, 865 (7th Cir. 1999)(recognizing that courts may consider defendant's presence in a high crime area as part of the totality of circumstances confronting the officer at the time of the stop).

[8] Special Agent Morales has been approximately 15 years with HSI (initially INS [Immigration and Naturalization Service], subsequently ICE [Immigration and Customs Enforcement], and finally HSI (Transcript at pp. 4-5). He started his career as an immigration inspector at the San Juan International Airport and thereafter became a special agent under the immigration and naturalization service. Id. at p. 5. He has received basic federal law enforcement training as well as criminal investigator training, and training on vehicle stops, searches, and investigation of immigration offenses. Id.

  ii.  **Search**

    a.  **Safety**

Officer safety could not have served to justify the search incident to the arrests. Agents had detained the four known occupants of the vehicle, patted them down, handcuffed them, and moved them to a point approximately ten to twenty feet from the vehicle, where they were kept under armed custody. In fact, the government is not arguing safety to justify the search (Transcript at pp. 86, 109, 111).

    b.  **Evidence**

A warrantless search of the vehicle in the scene was ordered to determine if there were other people in the vehicle and for evidence of the crime in the area immediately accessible to Aude. The search was reasonable. As stated above, three of the four occupants were illegal aliens, had sand in their shoes, and one of them –Aude– had a GPS inside a waterproof pouch. The vehicle had followed a suspicious or erratic pattern in the evening or early morning in an area next to a beach known for alien and drug smuggling. The circumstances presented the officers with a scenario of potential human smuggling, and support the notion that there may have been more evidence of the offense inside the vehicle. For that reason, officers had reasonable grounds to believe that evidence relevant to the crime of arrest might be found in the vehicle, and correspondingly, to search the vehicle for that evidence.

Defendant protests that after stopping the vehicle and apprehending Aude, officers already had the illegal alien in custody and the vehicle in their possession and control such that there was nothing else to look for (Transcript at pp. 107, 113-114). But that is not so. Given the crime of arrest, officers were entitled to search the vehicle for evidence such as cell phones used to coordinate movements between the arriving boat and the people awaiting to pick up individuals

coming in on the boat; GPS devices; maps; personal identification documents; papers with names, locations, addresses, and coordinates; insect repellent; firearms; food; and water. The situation was unlike the one the Supreme Court examined in Gant, supra, where defendant was arrested for driving with a suspended license.

Defendant posits there was no need to conduct the warrantless search, inasmuch as there could be no tampering of any evidence by the occupants of the vehicle, who were under custody, with the vehicle under the officers' control (Transcript at p. 108). The reasoning overlooks the fact that Gant's evidentiary justification does not depend on whether tampering is factually feasible, but on the link between the crime of arrest and the evidence to be searched for. See, United States v. Polanco, 634 F.3d 39, 42 (1st Cir. 2011)(rejecting argument that Gant limits warrantless vehicle searches to situations where an arrestee is unsecured and close enough to destroy evidence).[9] A search of an automobile incident to arrest is justified when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle. See, Gant, 556 U.S. at 335 (so holding).[10] The foregoing discussion shows that link was properly established to sustain the search.

### 2. Automobile Exception

The exception permits warrantless searches of motor vehicles on account of the exigencies attendant to ready mobility and the reduced expectations of privacy that people have in their vehicles, the use and movement of which are thoroughly regulated. See, California v. Carney, 471

---

[9] See also, 3 Wayne R. La Fave, Search & Seizure: A Treatise on the Fourth Amendment § 7.1(d)(5th ed.)(October 2016 update) (observing that Gant's evidentiary justification is not grounded in concern about the arrestee getting at weapons or evidence).

[10] Reasonable suspicion is less than probable cause and more than a naked hunch. See, United States v. McGregor, 650 F.3d 813, 821 (1st Cir. 2011)(so holding). The proper focus for evaluating the sufficiency of evidence of reasonable suspicion "centers upon the objective significance of the particular facts under all the circumstances." United States v. Woodrum, 202 F.3d 1, 7 (1st Cir. 2000).

U.S. 386, 392 (1985)(identifying both elements in analyzing search under automobile exception). In contrast to the Gant exception, however, the automobile exception requires probable cause to believe a vehicle contains evidence of criminal activity. See, Polanco, 634 F.3d at p. 42 (noting need for probable cause).[11]

A law enforcement officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present. See, United States v. White, 804 F.3d 132, 136 (1st Cir. 2015)(so observing). Probable cause is a fluid concept. Illinois v. Gates, 462 U.S. 213, 232, 235 (1983). The standard is satisfied when the totality of the circumstances create a fair probability that evidence of a crime will be found in a particular place. White, 804 F.3d at 136. All that is required is the kind of fair probability on which reasonable and prudent people, not legal technicians act. Id.

Given the facts surrounding the Nissan Armada's detention and the evidence uncovered when the occupants stepped out of the vehicle and were patted down, there was probable cause to support a search under the automobile exception. Under that exception, it matters not whether the vehicle was already parked, whether it was searched in another locale, or whether agents had time to obtain a warrant first. See, Polanco, 634 F.3d at 43 (so stating). As recognized in Michigan v. Thomas, 458 U.S. 259 (1982)(per curiam), even an immobilized car may be searched without a warrant with probable cause, because the exception "does [not] depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or

---

[11] Additionally, the Gant evidentiary justification does not extend beyond the crime of arrest, whereas the automobile exception is not so limited. See, Polanco, 634 F.3d at 42-43 (explaining differences between Gant and automobile exceptions to warrant requirement).

that its contents would have been tampered with, during the period required for the police to obtain a warrant. Id. at 261.

Defendant submits that if the search was justified, officers should have searched the whole vehicle instead of the area immediately accessible to Aude and the cargo area of the vehicle area they limited their search to (Transcript at pp. 116-117, 127). Pursuant to the automobile exception, the existence of probable cause to stop and search the vehicle authorizes agents to search without a warrant any area of the vehicle in which the evidence might be found. See, White, 804 F.3d at 138 (so noting). But that agents are so authorized does not mean they are constitutionally required to exercise the full scope of that authority in conducting a vehicle search rather than opting to search limited areas or compartments of the vehicle. The lawful warrantless search of a vehicle is restricted neither temporarily nor spatially. See, United States v. Panitz, 907 F.2d 1267, 1272 (1st Cir. 1990)(so recognizing). In consequence, it does not help defendant that agents limited the search to the area adjacent to Aude and the cargo area of the Nissan Armada.

### III.   CONCLUSION

Considering that the arrests and subsequent search of the vehicle by HSI agents were lawful, defendant's motion to suppress must be denied.

**SO ORDERED.**

In San Juan, Puerto Rico, this 10th day of January, 2017.

                                               s/Pedro A. Delgado-Hernández
                                               PEDRO A. DELGADO-HERNÁNDEZ
                                               U.S. DISTRICT JUDGE